UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

DOUGLAS GOODHART, Individually and on :
Behalf of All Others Similarly Situated,

               Plaintiff,   :

   vs.   :

HI-CRUSH PARTNERS LP, ROBERT E.   :
RASMUS, JAMES M. WHIPKEY, LAURA
C. FULTON, JEFFRIES V. ALSTON, III,   :
ROBERT L. CABES, JR., JOHN R. HUFF,
TREVOR M. TURBIDY, STEVEN A.   :
WEBSTER, BARCLAYS CAPITAL INC.,
MORGAN STANLEY & CO. LLC, CREDIT   :
SUISSE SECURITIES (USA) LLC, UBS
SECURITIES LLC, RAYMOND JAMES &   :
ASSOCIATES, INC., RBC CAPITAL
MARKETS, LLC, and ROBERT W. BAIRD   :
& CO. INCORPORATED,

             Defendants.   :

———————————————————— x

Civil Action No. CV 8574

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

CLASS ACTION



DEMAND FOR JURY TRIAL

RECEIVED
NOV 26 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased the common stock of Hi-Crush Partners LP (together with its subsidiaries, "Hi-Crush" or the "Partnership") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus issued in connection with its August 16, 2012 initial public stock offering ("IPO"), seeking to pursue *strict liability* remedies under the Securities Act of 1933 (the "1933 Act").

2.      Plaintiff Doughlas Goodhart ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Hi-Crush Partners LP's press releases, Securities and Exchange Commission ("SEC") filings, court filings, analyst reports, media reports and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      Hi-Crush Partners LP is a Delaware limited partnership formed on May 8, 2012 to acquire selected sand reserves and related processing and transportation facilities of Hi-Crush Proppants LLC.

4.      On August 16, 2012, the Partnership completed the IPO through the sale of 12,937,500 of the common units by the Sponsor at $17 per unit, receiving approximately $220 million in gross proceeds.

5.      The Registration Statement, issued in connection with the IPO as defined herein, described Hi-Crush as "a pure play, low-cost, domestic producer of premium monocrystalline sand, a specialized mineral that is used as a 'proppant' to enhance the recovery rates of hydrocarbons from

oil and natural gas wells." Its reserves consist of "Northern White" sand, a resource existing predominately in Wisconsin and limited portions of the upper Midwest region of the United States, which defendants stated is highly valued as a preferred proppant because it exceeds all American Petroleum Institute specifications. The Partnership owns, operates and develops the sand reserves and related excavation and processing facilities at its 561-acre facility with integrated rail infrastructure, located near Wyeville, Wisconsin. Hi-Crush processes and delivers approximately 1.6 million tons of frac sand per year.

6.      On August 16, 2012, Hi-Crush filed a final Prospectus for the IPO, which forms part of the Registration Statement and which became effective that same day (collectively, with the documents incorporated therein, the "Registration Statement").

7.      According to the Registration Statement, almost all of Hi-Crush's frac sand was being sold to four "leading investment grade-rated pressure pumping service providers under long-term, take-or-pay contracts that *require [its] customers to pay a specified price for a specified volume of frac sand each month*." (emphasis added). Emphasizing the strength of those customer relationships, the Registration Statement highlighted one of the four customers, Baker Hughes, as being a particularly important revenue source stating in pertinent part as follows:

> Our current customer base is comprised of subsidiaries of four of North America's largest providers of pressure pumping services: ***Baker Hughes Incorporated ("Baker Hughes")***, FTS International, LLC. ("FTS International"), Halliburton Company ("Halliburton") and Weatherford International Ltd. ("Weatherford"). ***Our largest customers based on current contracts, Baker Hughes*** and Halliburton, are each rated A2 / A by Moody's and Standard & Poor's, respectively, and Weatherford is rated Baa2 / BBB by these agencies. FTS International Services LLC, the subsidiary of FTS International that is the counterparty to our customer contract, is rated Ba3 / B by these agencies. Spears and Associates estimates that ***these four companies controlled 47% of North American pressure pumping fleet in 2011 and accounted for greater than 50% of the North American pressure pumping market***, based on 2011 revenue. For the year ended December 31, 2011, sales to Halliburton and Weatherford accounted for 64% and 36% of our total revenues, respectively.

> ***Sales under our contracts with Baker Hughes*** and FTS International ***commenced in May 2012***.

[Emphasis added]

8.     However, Hi-Crush's stock price would precipitously decline on November 13, 2012, falling $5 per share – ***approximately 25% of its prior night's closing price*** – on extremely high trading volume of more than 3.3 million shares trading following the Partnership's disclosure that Baker Hughes had unilaterally repudiated its supply contract with Hi-Crush, stating Hi-Crush was in breach. The press release Hi-Crush issued that day stated that following Baker Hughes' repudiation and failed efforts to negotiate, on November 12, 2012, Hi-Crush "formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement."

9.     Hi-Crush's lawsuit states that after signing a supply contract with Hi-Crush in October 2011, which would not take effect until May 2012, in February 2012 – ***six months prior to the IPO*** – Baker Hughes was demanding, and by May 2012 Hi-Crush had granted significant volume and other concessions in an effort to keep Baker Hughes from repudiating the entire supply contract then. Hi-Crush alleged in their petition that Baker Hughes' recent repudiation of the supply contract was part of a continuing effort to circumvent its binding purchase obligations under the supply contract which had apparently started with Baker Hughes' demands for volume concessions in February 2012.

10.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation as follows:

(a)     After executing the original supply contract with Hi-Crush in October 2011,

beginning in February 2012, Baker Hughes began expressing an unwillingness to comply with that

contract;

(b)     Six months prior to the IPO, Baker Hughes had demanded significant volume

and other concessions resulting in the execution of an amended supply contract;

(c)     According to Baker Hughes, Hi-Crush had, or was, violating confidentiality

provisions in the supply contract; and

(d)     As a result, Baker Hughes would repudiate all of its financial obligations

under the supply contract, materially decreasing Hi-Crush's revenues and profits attributable to that

important supply contract.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the

Securities Act.  This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15

U.S.C. §77v] and 28 U.S.C. §1331.

12.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28

U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in

this District and the Underwriter Defendants (defined below) maintain their principal places of

business in this District.

13.     In connection with the acts alleged in this Complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff Shirley Horn  purchased Hi-Crush common stock pursuant and/or traceable

to the IPO, and was damaged thereby.

- 4 -

15.     Defendant Hi-Crush is a publicly-traded Delaware limited partnership formed on May 8, 2012 to acquire selected sand reserves and related processing and transportation facilities of Hi-Crush Proppants LLC and headquartered in Houston, Texas.   The Partnership produces monocrystalline sand, a specialized mineral that is used as a 'proppant' to enhance the recovery rates of hydrocarbons from oil and natural gas wells.  Its reserves consist of "Northern White" sand, a resource existing predominately in Wisconsin and limited portions of the upper Midwest region of the United States.  The Partnership owns, operates and develops the sand reserves and related excavation and processing facilities at its 561-acre facility with integrated rail infrastructure, located near Wyeville, Wisconsin.  Hi-Crush processes and delivers approximately 1.6 million tons of frac sand per year.  Following the IPO, the Company's stock has been traded on the NYSE under the ticker symbol "HCLP."

16.     Defendant Robert E. Rasmus is and was at the time of the IPO,  Co-Chief Executive Officer and a Director of Hi-Crush.

17.     Defendant James M. Whipkey is and was at the time of the IPO,  Co-Chief Executive Officer and a Director of Hi-Crush.

18.     Defendant Jefferies v. Alstron, III is and was at the time of the IPO, Chief Operating Officer and a Director of Hi-Crush.

19.     Defendant Chad M. McEver is and was at the time of the IPO, a Director of Hi-Crush.

20.     Defendant Robert L. Cabes, Jr. is and was at the time of the IPO, a Director of Hi-Crush.

21.     Defendant John R. Huff is and was at the time of the IPO, a Director of Hi-Crush.

22.     Defendant Trevor T. Turbidy is and was at the time of the IPO, a Director of Hi-Crush.

- 5 -

23.     Defendant Steven A. Webster is and was at the time of the IPO, a Director of Hi-Crush.

24.     The defendants referenced above in ¶¶16-23 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement.

25.     Defendant Barclays Capital, Inc. ("Barclays"), based in New York, New York, provides securities brokerage and financial advisory services and operates as a subsidiary of Barclays PLC Private Banking & Investment Banking Investment. Barclays acted as an underwriter and joint book-running manager of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

26.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley"), based in New York, New York, is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley acted as an underwriter and joint book-running manager of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

27.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse"), based in New York, New York, is a financial services company that advises clients in all aspects of finance, serving companies, institutional clients and high-net-worth private clients worldwide. Credit Suisse acted as an underwriter and joint book-running manager of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

28.     Defendant UBS Securities LLC ("UBS"), an indirect wholly-owned subsidiary of Switzerland-based UBS AG, provides a full range of investment banking services, including corporate finance, mergers and acquisitions, capital markets, trading and sales, fixed income, equity research and prime brokerage operations. UBS's U.S. headquarters are located in New York, New York. UBS acted as an underwriter and joint book-running manager of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

29.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a publicly owned full service investment bank listed on the NYSE. Raymond James acted as an underwriter of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

30.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian investment bank, part of the Royal Bank of Canada. RBC's U.S. headquarters are located in New York, New York. RBC Capital acted as an underwriter of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

31.     Defendant Robert W. Baird & Co. Incorporated ("Baird") is the principal U.S. operating subsidiary of Baird, a Milwaukee, Wisconsin-based, international, employee-owned financial services firm providing wealth management, capital markets, private equity, and asset management services to individuals, corporations, institutional investors, and municipalities. Baird acted as an underwriter of Hi-Crush's IPO, helping to draft and disseminate the offering documents.

32.     The defendants named in ¶¶25-31 are referred to herein as the "Underwriter Defendants." Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO

and shared approximately $13.5 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Hi-Crush stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Hi-Crush, met with potential investors and presented highly favorable information about the Partnership, its operation, and its financial prospects;

(b)     The Underwriter Defendants also demanded and obtained an agreement from Hi-Crush that Hi-Crush would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Hi-Crush had purchased millions of dollars in directors and officers' liability insurance;

(c)     Representatives of the Underwriter Defendants also assisted Hi-Crush and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Hi-Crush, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Hi-Crush's operations and financial prospects;

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Hi-Crush's lawyers, management and top executives and engaged in "drafting sessions" between at least May 2012 and August 2012. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Hi-Crush stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Hi-Crush

would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Hi-Crush management and top executives, the Underwriter Defendants knew, or should have known, of Hi-Crush's existing problems as detailed herein; and

(e)   The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

33.   Hi-Crush is a Delaware limited partnership formed on May 8, 2012 to acquire selected sand reserves and related processing and transportation facilities of Hi-Crush Proppants LLC. In connection with its formation, the Partnership issued: (a) a non-economic general partner interest to its General Partner; and (b) a 100.0% limited partner interest to the Sponsor, its organizational limited partner. Hi-Crush is managed and operated by the board of directors and executive officers of the General Partner, which is a wholly owned subsidiary of the Sponsor.

34.   Through August 15, 2012, the General Partner owned 100% of Hi-Crush's sand reserves and related excavation and processing facilities located in Wyeville, Wisconsin. On August 16, 2012, the Sponsor contributed its ownership of the General Partner, Hi-Crush Railroad LLC, Hi-Crush Wyeville LLC, Hi-Crush Operating LLC and $4,606 of cash to the Partnership. In addition, the Sponsor agreed to: (1) convert all $23,916 of consolidated net intercompany receivables due from the Partnership into capital; and (2) assume via capital contribution $10,028 of outstanding accounts payable maintained by the General Partner as of the transaction date. In return, the Partnership issued 13,640,351 common units and 13,640,351 subordinated units to the Sponsor. In

connection with this transaction, the Partnership also completed the IPO through the sale of 12,937,500 of the common units by the Sponsor.

35.     At some point prior to June 14, 2012, Hi-Crush filed with the SEC a confidential registration statement on Form S-1 (the "Registration Statement"), which would later be utilized for the IPO following several amendments in response to comments by the SEC. On or about August 16, 2012, Hi-Crush filed its final Prospectus for the IPO, which forms part of the Registration Statement and which became effective on August 15, 2012.

36.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

37.     First, emphasizing the strength of its relationship with Baker Hughes and the significance Hi-Crush was placing on that relationship, the Registration Statement referred to Baker Hughes as being "***under [a] long-term, take-or-pay contract[] that require[d] [it] to pay a specified price for a specified volume of frac sand each month.***" (emphasis added). This statement was materially misleading because rather than being "long-term," the contract had only quite recently been significantly modified to the detriment of Hi-Crush at the demand of Baker Hughes.

38.     Second, as to "Customers and Contracts," the Registration Statement stated as follows:

> Our current customer base is comprised of subsidiaries of four of North America's largest providers of pressure pumping services: Baker Hughes Incorporated ("Baker Hughes"), FTS International, LLC. ("FTS International"), Halliburton Company ("Halliburton") and Weatherford International Ltd. ("Weatherford"). ***Our largest customers based on current contracts, Baker Hughes*** and Halliburton, are each rated A2 / A by Moody's and Standard & Poor's, respectively, and Weatherford is rated Baa2 / BBB by these agencies. FTS International Services LLC, the subsidiary of FTS International that is the counterparty to our customer contract, is rated

- 10 -

Ba3 / B by these agencies.  Spears and Associates estimates that these four companies controlled 47% of North American pressure pumping fleet in 2011 and accounted for greater than 50% of the North American pressure pumping market, based on 2011 revenue.  For the year ended December 31, 2011, sales to Halliburton and Weatherford accounted for 64% and 36% of our total revenues, respectively. Sales under our contracts with Baker Hughes and FTS International commenced in May 2012.

We sell substantially all of the frac sand we produce under *long-term, take-or-pay contracts that significantly reduce our exposure to short-term fluctuations in the price of and demand for frac sand.*  For the year ended December 31, 2011 and the first half of 2012, we generated 99% of our revenues from frac sand delivered under our long-term sand sales contracts, *and we expect to continue selling a significant majority of our sand under long-term contracts. As of June 30, 2012, we had four long-term sand sales contracts with a weighted average remaining life of approximately 4.6 years.*  The following table presents a summary of our contracted volumes and revenues from 2011 through 2015, *as well as the average contract sales price and make-whole price our customers are obligated to pay in the event they decline to accept delivery of the required product volumes under their respective contracts.*

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | 2014 | 2015 |
| Contracted Volumes (tons) | 331,667 | 1,216,667 | 1,460,000 | 1,295,000 | 1,130,000 |
| % of Processing Capacity(1) | 79% | 85% | 91% | 81% | 71% |
| Contracted Revenue | $ 19,916,667 | $ 78,966,667 | $ 96,466,667 | $ 88,350,000 | $ 80,100,000 |
| Average Sales Price per ton | $60 | $65 | $66 | $68 | $71 |
| Average Make-Whole Price per ton | $60 | $49 | $49 | $51 | $51 |

(1) Percentage of processing capacity for 2011 and 2012 based on weighted average processing capacity for such periods.

As the above table illustrates, when one of our contracts expires in 2014, the average contracted price per ton will increase. The expiring contract provides for sales prices lower than current market prices. Prior to this contract's expiration, we will seek to renew or replace this contract on pricing terms more comparable to market prices at the time. Occasionally, if we have excess production and market conditions are favorable, we may elect to sell frac sand in spot market transactions.

39.     These statements concerning "Customers and Contracts" were materially false and misleading because they failed to disclose that Baker Hughes had been demanding significant concessions under the Baker Hughes supply contract and thus materially overstated the value of the contract to Hi-Crush.

- 11 -

40.     Third, the Registration Statement referred to its "stable, long-term, take-or-pay"
supply contract strategy, stating "[w]e believe this contracting strategy *significantly mitigates our*
*exposure to the potential price volatility of the spot market for frac sand in the short-term, allows*
*us to take advantage of any increase in frac sand prices over the medium-term and provides us*
*with long-term cash flow stability."* (emphasis added). This statement was materially false and
misleading because, as Hi-Crush itself alleged in its lawsuit against Baker Hughes, that relationship
was anything but stable at the time of the IPO, and was providing little or no mitigation to exposure
to price volatility.

41.     Fourth, the Registration Statement described as one of the Partnership's "Competitive
Advantages," the purported "Long-term contracted cash flow stability" derived from the Baker
Hughes supply contract.  Stating in pertinent part as follows:

> We will generate substantially all of our revenues from the sale of frac sand under
> long-term *contracts that require subsidiaries of Baker Hughes*, FTS International,
> Halliburton and Weatherford *to pay specified prices for specified volumes of*
> *product each month*. We believe that the take-or-pay volume and pricing provisions
> and the long-term nature of our contracts will provide us with a stable base of cash
> flows and limit the risks associated with price movements in the spot market and any
> changes in product demand during the contract period.

[Emphasis added].

These statements were materially false and misleading because Baker Hughes was balking at
complying with the supply contract.

42.     Fifth, the Registration Statement stated that Hi-Crush was "currently contracted to
sell 1,460,000 tons of frac sand annually from our Wyeville facility, and as of June 30, 2012, our
contracts had a weighted average remaining life of approximately 4.6 years." This statement was
materially false and misleading because Baker Hughes was balking at complying with the supply
contract.

43.     Under the ruled and regulations governing the preparation of the Registration Statement, Hi-Crush was required to disclose the problems with Bakker Hughes and the supply contract. The Registration Statement, however, contained no such disclosure.

44.     The IPO was successful for the Partnership, the Sponsor and the Underwriters. More than 12.9 million shares of Hi-Crush common stock were sold to the public at $17 per share, raising approximately $220 million in gross proceeds for the Sponsor.

45.     On November 13, 2012, Hi-Crush's stock price declined precipitously, by $5 per share – *approximately 25% of its prior night's closing price*– on extremely high trading volume of more than 3.3 million shares trading following the Partnership's disclosure that Baker Hughes had unilaterally repudiated its supply contract with Hi-Crush, stating Hi-Crush was in breach. The press release issued that day stated in relevant part as follows:

> Hi-Crush also announced today the termination of the supply agreement with Baker Hughes Oilfield Operations, Inc.  On September 19, 2012, Baker Hughes provided notice that it was terminating the contract.  Hi-Crush believes that Baker Hughes' termination was wrongful and a direct effort to circumvent its binding purchase obligations under the supply agreement.  Hi-Crush engaged in discussions with Baker Hughes after receiving the notice, but the parties were unable to reach a mutually satisfactory resolution of the matter.  On November 12, 2012, Hi-Crush formally terminated the supply agreement and filed suit in the State District Court of Harris County, Texas against Baker Hughes seeking damages for Baker Hughes' prior wrongful termination of the supply agreement.

46.     The Original Petition seeking liquidated damages Hi-Crush filed in Harris County District Court, *Hi-Crush Operating LLC vs. Baker Hughes Oilfield Operations,* No. 201267261, on November 12, 2012, further stated in relevant part:

> 7.     . . . Approximately one year ago, Baker signed a six-year "take-or-pay" contract to purchase frac sand from Hi-Crush (the "Supply Agreement").  Now apparently *unhappy with the contract it signed*, Baker attempted to walk away from its obligations entirely, causing substantial injury to Hi-Crush.  To make matters worse, Baker has wrongfully tried to shift the blame for its breach to Hi-Crush, even going so far as to issue its own, sham notice of termination of the Supply Agreement.

*          *          *

10.     Baker and Hi-Crush signed the Supply Agreement in October 2011, and its originally agreed-upon Term was May 1, 2012 to April 30, 2017.  For the duration of that Term, the supply Agreement required Baker to buy (and Hi-Crush to sell) certain minimum amounts of sand (at a specified price per ton) on a monthly and annual basis, or else be subject to certain liquidated damages obligations.  If Hi-Crush failed to supply or Baker failed to take delivery of the requisite amount of sand, then the offending party either had to make up its deficit in a manner specified by the Supply Agreement or pay an agreed upon amount per short ton as liquidated damages.

11.     Beginning in February 2012 – before the Supply Agreement even took effect – *Baker approached Hi-Crush seeking to reduce the amount of sand it was required to take under the Supply Agreement*.  Although Hi-Crush was under no obligation to do so, *Hi-Crush agreed to reduce the minimum amount of sand that Baker was required to purchase in the first contract year, among other concessions.*  The parties also agreed to extend the Supply Agreement for an additional year (until April 30, 2018) and to a modification of the price term.  These agreements are contained in the First Amendment to Supply Agreement ("First Amendment"), *which the parties signed on May 10, 2012*, with retroactive effect to May 1, 2012.

12.     The Supply Agreement provides in §8.1 that it shall continue in effect through April 30, 2018, "unless earlier terminated as provided herein."  Section 8.2 (entitled "Termination by Baker") sets out the means and circumstances in which Baker can terminate the Agreement, and § 8.3 (entitled "Termination by Supplier") does the same for Hi-Crush.

\*            \*            \*

15.     . . . on September 19, 2012, Baker sent Hi-Crush a letter purporting to terminate the Supply Agreement based on two meritless allegations that Hi-Crush had breached the *confidentiality obligations* contained in Article 6 of the Supply Agreement.

\*            \*            \*

17.     Since its September 19, 2012 termination letter, Baker has not ordered any additional sand from Hi-Crush.  Instead, Baker confirmed its intention to abandon, renounce, and refuse to perform its obligations to take or pay for Hi-Crush's sand as required by the Supply Agreement.

18.     As a result of Baker's actions, including Baker's failure to cure its refusal to take delivery of or pay for sand from Hi-Crush and Baker's failure to withdraw its wrongful termination letter, High-Crush validly terminated the Supply Agreement on November 12, 2012 pursuant to its terms.

\*            \*            \*

- 14 -

23. ***Baker's repudiation of and failure to comply with its obligations under the Supply Agreement has caused Hi-Crush substantial injury. . . . and substantially impaired the value of the Supply Agreement to Hi-Crush.***

[Emphasis added.]

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Hi-Crush common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Hi-Crush or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether statements made by Defendants to the investing public in the Registration Statement and Prospectus misrepresented material facts about the business and operations of Hi-Crush; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §11 of the 1933 Act by All Plaintiffs
### Against All Defendants

53.     Plaintiff incorporates ¶¶1-52 by reference.

54.     This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

55.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

56.     The Defendants are strictly liable to plaintiffs and the Class for the misstatements and omissions.

57.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

58.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

59.     Plaintiff acquired Hi-Crush common stock traceable to the IPO.

60.     Plaintiff and the Class have sustained damages.  The value of the Hi-Crush common stock has declined substantially subsequent to and due to Defendants' violations.

61.     At the time of their purchases of Hi-Crush common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

62.     Plaintiff incorporates ¶¶1-61 by reference.

63.     By means of the defective Prospectus, Defendants promoted and sold Hi-Crush stock to Plaintiff and other members of the Class.

64.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Hi-Crush common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

65.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time it acquired Hi-Crush common stock.

66.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Hi-Crush common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against the Partnership and the Individual Defendants

67.     Plaintiff incorporates ¶¶1-66 by reference.

68.     This Cause of Action is brought pursuant to §15 of the 1933 Act against the Partnership and the Individual Defendants.

69.     The Individual Defendants each were control persons of Hi-Crush by virtue of their positions as directors and/or senior officers of Hi-Crush.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Hi-Crush.   The Partnership controlled the Individual Defendants and all of Hi-Crush's employees.

70.     The Individual Defendants each were culpable participants in the violations of §11 of the 1933 Act alleged in the Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, appointing Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 26, 2012

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

BOTTINI & BOTTINI, INC.
FRANK A. BOTTINI
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:  858/914-2001
858/914-2002 (fax)

*Attorneys for Plaintiff*

- 20 -

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Douglas Goodhart, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint with my counsel and authorized its filing.

2.  I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  My purchases and sales of the securities of Hi-Crush Partners LP during the Class Period are as follows: Purchased 100 shares on September 13, 2012 at $ 2126 per share.

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses — such as lost wages and travel expenses — directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 21th day of November, 2012.

_____
Douglas Goodhart